# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| ASSAF MHANNA and<br>TAMMY MHANNA, | Civil No. 10-292 (JRT/RLE) |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND<br>SECURITY CITIZENSHIP AND<br>IMMIGRATION SERVICES;<br>SHARON DOOLEY; UNKNOWN AND<br>UNNAMED U.S. DEPARTMENT OF<br>HOMELAND SECURITY CITIZENSHIP<br>AND IMMIGRATION SERVICES<br>OFFICIAL IDENTIFIED ONLY AS "RAH";<br>ALEJANDRO MAYORKAS;<br>JANET NAPOLITANO; ERIC J. HOLDER;<br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, U.S. IMMIGRATION AND<br>CUSTOMS ENFORCEMENT, and<br>SCOTT BANIECKE, | **MEMORANDUM OPINION<br>AND ORDER DENYING<br>PLAINTIFFS' MOTION FOR<br>EMERGENCY TEMPORARY<br>RESTRAINING ORDER AND<br>REQUEST FOR INJUNCTIVE<br>RELIEF** |
| Defendants. | |

Phillip F. Fishman and Rachel M. Engebretson, **FISHMAN, BINSFELD & BACHMEIER, P.A.**, 8011 34th Avenue South, Suite 245, Bloomington, MN 55425, for plaintiffs.

Friedrich A. P. Siekert, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for defendants.

On February 1, 2010, Plaintiffs Assaf Mhanna and Tammy Mhanna brought this

action against the United States Department of Homeland Security, Citizenship and

Immigration Services ("USCIS"); Sharon Dooley, the Field Office Director of the

St. Paul Field office of the USCIS; an unknown USCIS official identified as "RAH"; Alejandro Mayorkas, Director of USCIS; Janet Napolitano, Secretary of the Department of Homeland Security; Eric J. Holder, United States Attorney General; the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement ("ICE"); and Scott Baniecke, Field Office Director of the ICE St. Paul Field Office (collectively, "defendants").  (Compl., Docket No. 1.)  Also on February 1, 2010, the Mhannas filed a Motion for Emergency Temporary Restraining Order and Request for Injunctive Relief. (Docket No. 2.)  For the reasons stated below, the Court denies the motion.

## BACKGROUND

Assaf Mhanna ("Mhanna") is a citizen and native of Lebanon.  (Compl. ¶ 5, Docket No. 1.)  Tammy Mhanna is his spouse and a U.S. Citizen.  (*Id.* ¶ 13.)

### A.    Mhanna's Entry on December 8, 1998

Mhanna was first paroled into the United States on or about December 8, 1998, at the Point of Entry in Nogales, Arizona.  (*Id.* ¶ 16; Mem. Supporting TRO & Emergency Req. for Injunctive Relief at 4, Docket No. 3.)  Upon Mhanna's inspection at entry, an officer of the Immigration and Naturalization Service[1] ("INS") completed a Form I-213, Record of Deportable/Inadmissible Alien.  (Mot. to Reopen & Reconsider Ex. 2, Engebretson Aff. Ex. E, Docket No. 4.)  It includes the following narrative:

---

[1] "On March 1, 2003, the Department of Homeland Security absorbed the former Immigration and Naturalization Service.  USCIS, a division of DHS, is responsible for the adjudication of immigrant visa petitions." *Abdelwahab v. Frazier*, 578 F.3d 817, 819 n.2 (8th Cir. 2009) (citation omitted).

Subject arrived this date afoot from Mexico seeking admission as[] a citizen of the United States.  Subject stated to the primary officer, [Immigration Inspector] Stephen Hathaway, he was an American. Hathaway asked the subject a few more questions whereupon the subject admitted his true nationality.  He was escorted to INS secondary.

In secondary inspection a sworn statement was taken by [Special Operations Immigration Inspector] J. Dayhoff.  In the statement the subject admitted his nationality.  He further stated he travelled [sic] from Beirut to Amsterdam to Mexico City to Hermosillo.  He stated he has friends in Hermosillo which [sic] are also from Lebanon.  The subject then stated he came from Lebanon to the United States because he is Christian and can not live in Lebanon because it is a Muslim country.

The subject was advised he would be held in INS custody pending a decision on his claim of fear to return to his country.  He was given and acknowledged receipt of form M-444.  He appears inadmissible per [§] 212(a)(6)(C)(ii) [of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(C)(ii)[2]] and transferred to the Florence detention facility to await his hearing.

---

[2] INA § 212(a)(6)(C)(ii), 8 U.S.C. § 1182(a)(6)(C)(ii), states in relevant part:

    (a)    Classes of aliens ineligible for visas or admission

            Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

            . . . .

    (6)    Illegal entrants and immigration violators

            . . . .

        (C)    Misrepresentation

                . . . .

            (ii)    Falsely claiming citizenship

                (I)    In general

                      Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter . . . or any other Federal or state law is inadmissible.

                . . . .

(*Id.*)  Dayhoff's Form I-867A, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, records Mhanna's sworn statement on December 8, 1998.  (*Id.*)  In relevant part, it states:

> Q:   Is there any way possible you could be a citizen of the United States?
>
> A:   No.
>
>       . . . .
>
> Q:   What documents did you show the first inspector you saw in order to enter the United States?
>
> A:   No.  I told him I was an American citizen.

Mhanna reviewed and signed the record, indicating that it is "a full, true and correct record of [his] interrogation."  (*Id.*)

On December 23, 1998, Mhanna had a credible fear interview during which he was represented by counsel and assisted by an Arabic language interpreter.  (*Id.*)  The purpose of the interview was "to determine whether [Mhanna] ha[s] a fear of persecution or harm in [his] home country."  (*Id.*)  The Asylum Pre-Screening Officer who conducted the credible fear interview found that Mhanna's testimony was credible and that Mhanna had a credible basis for fear of persecution in his home country on account of religion and political opinion.  (*Id.*)  The officer found that Mhanna has "a significant possibility that he . . . could establish eligibility for asylum."  (*Id.*)  The officer's notes indicate that Mhanna offered the following information about his inspection on December 8, 1998:

> Q:   At any time did [you] use a different name or pretend to be someone else[?]
>
> A:   No, this is the [first] time I came to the States, [and I] told them at the border I was a U.S. Citizen[.]
>
> Q:   Why[?]

A:      I don't know but I thought I could say this.

(*Id.*)

## B.      Mhanna's Asylum Proceedings and Immediate Relative Immigrant Visa Petition

The INS subsequently released Mhanna from detention and paroled him into the United States, and on December 15, 1999, Mhanna filed an application for asylum, withholding of removal, and relief under the Convention Against Torture.  (Resp. to Dec. 2, 2009 Req. for Initial Evidence at 1, Mot. to Reopen & Reconsider Ex. 2, Engebretson Aff. Ex. E, Docket No. 4; *In re Mouhanna*,[3] No. A77393085, Slip Op. at 2, Mot. to Reopen & Reconsider Ex. 4, Engebretson Aff. Ex. E, Docket No. 4.)  His asylum application was referred to the Immigration Court.  (*In re Mouhanna*, Slip Op. at 2.)  On March 14, 2001, Mhanna was served with a Notice to Appear in Removal Proceedings. (Compl. ¶ 17, Docket No. 1.)

In January 2002, an Immigration Judge ("IJ") held a hearing on Mhanna's petition. (Jan. 31, 2002 Tr., Mot. to Reopen & Reconsider Ex. 3, Engebretson Aff. Ex. E, Docket No. 4.)  Mhanna's attorney questioned him about the events of December 8, 1998:

Q:      Okay.  Now, let's turn to your coming to the United States.  When you came to the border at Nogales, did you go to border crossing with INS inspectors?

A:      I entered from a big door that you get to the United States.

Q:      Okay.  And did you come up to the border on foot?

A:      Yes, walking.

Q:      All right.  And when you came into the INS checkpoint there, were there other people in line with you?

---

[3] The captions in many of the immigration proceedings and in the proceedings before the U.S. Court of Appeals for the Ninth Circuit use this alternative spelling of Mhanna's surname.

A:     There was a line in front of me and I stood in the line.

Q:     All right.  And when you first spoke to the INS inspector, what language did he speak to you?

A:     There was a policeman standing, he spoke to me in English.

Q:     Okay.  And did he ask you for your documents?

A:     He asked me for I.D. and I told him I didn't have any.

Q:     Okay.  Did you tell him you are a citizen of the United States?

A:     He was asking a lot of people in front of me, so I told him yes.

Q:     Okay.  Did you later tell the officer that you were not from the United States?

A:     Right away I told him.

Q:     Did you tell the officer where you were from?

A:     Yes, I told him where I'm from.

Q:     Where did you say?

A:     I told him I am from Lebanon and I came from Lebanon.

. . . .

Q:     At the time he asked you if you were a citizen, did you know the meaning of that word in English?

A:     No.

Q:     Did you have any intent to falsely claim U.S. citizenship?

A:     No, because I told him right away afterwards when I understood the question that I wasn't, I was Lebanese.

(*Id.* at 15-18.)  On cross-examination, Mhanna testified as follows:

Q:     And now, you were standing in a line to enter the United States, and did you have a document that authorized you to come in the United States?

A:     No.

Q:     Okay.  So, you told the inspector that you were a United States citizen?

A:     He asked me and at that I didn't know what, what, what he meant, what the question meant, so I told him, I thought that's what he want, what I'm supposed to say.

Q:     You thought you were supposed to say you were a United States citizen?

A:     I didn't understand the question.

Q:     Now, sir, when you first saw the first immigration inspector when you were trying to come into the United States, what did he say to you?

    . . . .

A:     He asked me for I.D.

Q:     Okay.  What did you show him?

A:     I told him I don't have I.D.

Q:     What did he ask you next?

A:     He asked me if I, if I'm American, I didn't understand the question, and that is the reason I answered, I answered yes.

Q:     Okay.  Well, why did you – did you use the words American?

A:     No, I answered yes, because I didn't understand.

Q:     You didn't understand what you were being asked?

A:     No, I didn't understand what I was being asked.

Q:     And how is it that after being asked several times, you figured out that you should say you were Lebanese?

A:     When he took me aside, it was about two minutes later, and he asked me where I came from, and I understood that I was supposed to tell him I came from Lebanon, and that's what I told him.

Q:     Okay.

A:     I didn't understand, I didn't understand the word citizenship at that time.

(*Id.* at 30-31.)

On February 1, 2002, Immigration Judge Anna Ho issued a written order denying Mhanna's application for asylum, withholding of removal, and relief under the Convention Against Torture.  (*In re Mouhanna*, Slip Op. at 29.)  The IJ also sustained the government's charge under INA § 212(a)(6)(C)(i), and ordered that Mhanna be removed to Lebanon.  The IJ made the following adverse credibility determination relating to Mhanna's testimony about the events of December 8, 1998:

During the entire time of the applicant's testimony, he twisted a pen on the table in front of him, acting as though he was very nervous. Particularly when he was questioned as to whether he told the immigration inspector that he was a United States citizen, he moved around in his chair and kept playing with the pen before him.  This is the mannerism of someone who appears to the court to be trying to explain away his first statement to the immigration inspector that he was a United States citizen.

The applicant denied that he claimed he was a United States citizen when he got to the border.  The applicant also claimed that he did not speak English.  However, when the Service went into all of the questions and answers, he affirmed all of the facts.  The applicant is not credible as to his testimony that he did not claim U.S. citizenship.  According to the "Q&A," Exhibit 4, page 3, he stated as follows:

"Q.  What documents did you show the first inspector you saw in order to enter the United States?  A.  No.  I told him I was an American citizen."  If the applicant did not understand the question, or the word, "citizen," as he testified in court, he would not have been able to say, ". . . I was an American citizen."

Therefore, . . . the Court finds that the Service met its burden of proof in proving that the applicant falsely represented himself to be a U.S. citizen.  Furthermore, the charge of fraud and material misrepresentation is sustained.

(*In re Mouhanna*, Slip Op. at 23-24.)   The IJ also found that Mhanna's testimony regarding his fear of persecution was not credible, and found that his fear of returning to Lebanon was not objectively reasonable.  (*Id.* at 24-25.)  Therefore, the IJ found that Mhanna had "failed to meet his burden that he has a well-founded fear of persecution . . . , failed to establish that it is more likely than not that his life or freedom would be threatened in Lebanon and that he has been subjected to "torture" as defined under [the Convention Against Torture]."  (*Id.* at 28-29.)

Mhanna filed an appeal with the Board of Immigration Appeals ("BIA").  (*See* Mot. to Reopen & Reconsider Ex. 5, Engebretson Aff. Ex. E, Docket No. 4.)  The BIA exercised its power to conduct a *de novo* review of the record, and dismissed his appeal,

finding "that Mouhanna did not sustain his burden of demonstrating that he has a well-founded fear of future persecution in Lebanon[.]"  *See Mouhanna v. Ashcroft*, 118 Fed. Appx. 232, 233 (9th Cir. 2004).  The BIA did not make any findings about Mhanna's credibility.  *Id.*  On October 22, 2003, Mhanna was ordered removed.  (Order of Supervision, Engebretson Aff. Ex. F, Docket No. 4.)

Mhanna petitioned the UNITED STATES Court of Appeals for the Ninth Circuit[4] for review of the BIA's final order dismissing his appeal from the IJ's denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture.  *Mouhanna*, 118 Fed. Appx. at 232.  On October 5, 2004, while that petition was pending, Mhanna married Tammy Mhanna.  (Resp'ts' Resp. to Petitioner's Emergency Mot. for TRO & Prelim. Injunctive Relief from Immediate Deportation at 4, Docket No. 7.)

In a memorandum disposition dated December 13, 2004, the Ninth Circuit denied the petition, finding that, even assuming Mhanna's testimony was credible, "[s]ubstantial evidence supports the BIA's finding that Mouhanna" was not eligible for asylum or other relief.  *Mouhanna*, Fed. Appx. at 233.  The court noted that "Mouhanna was never personally confronted, threatened, or harmed as a result of his affiliation with the Difaa Shaabi," a civilian political branch of the Lebanese Forces.  *Id.*

---

[4] Mhanna petitioned the Ninth Circuit for review because his asylum proceedings were held in an immigration court in Seattle, Washington.

On January 28, 2005, Tammy Mhanna filed an Immediate Relative Immigrant Visa Petition pursuant to INA § 201(b), 8 U.S.C. § 1151(b), naming Assaf Mhanna as the beneficiary.  (*See* Engebretson Aff. Ex. B at 2, Docket No. 4; *id.* Ex. D.)

On March 4, 2005, Mhanna filed a motion with the BIA to reopen removal proceedings.  (Resp'ts' Resp. to Pet'rs' Emergency Mot. for TRO & Prelim. Injunctive Relief from Immediate Deportation at 4, Docket No. 7.)  *See Mouhanna v. Gonzales*, 234 Fed. Appx. 462 (9th Cir. 2007).

On April 1, 2005, while the motion to reopen was pending, USCIS approved Tammy Mhanna's Immediate Relative Immigrant Visa Petition, filed pursuant to INA § 201(b), 8 U.S.C. § 1151(b).  (Compl. ¶ 5, Docket No. 1.)  The notice of approval stated that the visa petition had been approved, but cautioned that "the approval gives no assurance that the beneficiary will automatically be found eligible for visa issuance, admission to the United States or adjustment to lawful permanent resident status. Whether the beneficiary gets a visa is decided only when an application is made to a consular officer; whether the beneficiary is admitted or adjusts status in the United States is decided only when an application is made to an immigration officer."  (Engebretson Aff. Ex. D, Docket No. 4.)

On July 27, 2005, the BIA denied the "motion to reopen as untimely because it was not filed until more than one year after the BIA issued its final order of removal." *Mouhanna*, 234 Fed. Appx. at 462.  Mhanna then filed with the Ninth Circuit a petition for review of the BIA order denying his motion to reopen.  *See id.*  In a memorandum disposition dated June 4, 2007, the Ninth Circuit denied the petition for review, holding

that the BIA did not abuse its discretion in denying the motion.  *Id.*  The court concluded that Mhanna "failed to timely file his motion to reopen," and that he "did not show he was entitled to equitable tolling."  *Id.*  The court also noted that he "failed to present new and material evidence of changed conditions in Lebanon."  *Id.*

On May 14, 2008, ICE issued Mhanna an Order of Supervision, directing that he participate in ICE's Intensive Supervision Appearance Program.  (Engebretson Aff. Ex. F, Docket No. 4.)  The order imposed various conditions on Mhanna and obligated him to report to ICE on a regular basis.  (*Id.*)

On June 11, 2008, Mhanna filed a second motion with the BIA to reopen removal proceedings.  *Mouhanna v. Holder*, 318 Fed. Appx. 509 (9th Cir. 2009).  On October 27, 2008, the BIA issued an order denying the motion to reopen, finding that Mhanna failed to meet his burden of establishing a prima facie asylum claim to support reopening, and finding that the motion was "untimely and numerically barred."  *See id.* at 509.  Mhanna filed with the Ninth Circuit a petition for review of the BIA order denying the second motion, and in a memorandum disposition dated March 9, 2009, the Ninth Circuit denied the petition for review.  *Id.*  The Ninth Circuit held that the BIA did not abuse its discretion and noted that Mhanna's "motion to reopen to apply for asylum failed to present evidence of changed country conditions in Lebanon that is material to petitioner and his circumstances."  *Id.*  The Ninth Circuit added that "[t]he temporary stay of removal shall continue in effect until the issuance of the mandate."  *Id.*  Mhanna then filed a motion to stay the mandate, which the court denied on May 1, 2009.  (*Mouhanna v. Holder*, No. 08-74692, Docket Nos. 10, 12 (9th Cir. Apr. 24, 2009, May 1, 2009).)  The

mandate issued on May 12, 2009.  (*Mouhanna v. Holder*, No. 08-74692, Docket No. 15 (9th Cir. May 12, 2009).)

On June 24, 2009, Mhanna filed another petition for review with the Ninth Circuit. In an order dated December 9, 2009, the court denied Mhanna's motion for a stay of removal pending review, citing *Nken v. Holder*, 129 S. Ct. 1749 (2009).  *Mouhanna v. Holder*, No. 09-71937 (9th Cir. Dec. 9, 2009).  The court also denied the government's motion for summary disposition, finding that "the questions raised by this petition for review are sufficiently substantial to warrant further consideration by a merits panel."  *Id.* The court also set a briefing schedule for the case.  *Id.*

On December 18, 2009, Mhanna filed an "urgent motion for a stay of removal" with the Ninth Circuit.  *Mouhanna v. Holder*, No. 09-71937 (9th Cir. Dec. 21, 2009).  The court construed the motion as a motion for reconsideration of the December 9, 2009 order, and in an order dated December 21, 2009, denied the motion for reconsideration. *Id.*  The order stated that "[n]o motions for reconsideration, modification, or clarification of this order shall be filed or entertained."  *Id.*

On December 22, 2009, Mhanna filed an application for stay of deportation or removal with ICE.  (Engebretson Aff. Ex. G, Docket No. 4.)  On December 29, 2009, ICE denied the application.  (*Id.*)

### C.    Mhanna's Adjustment of Status Proceedings

On October 28, 2009, the BIA issued *Matter of Yauri*, 25 I & N. Dec. 103 (BIA 2009).  In that decision, the BIA "emphasize[d] that the existence of a final order of removal does **not** preclude the USCIS from granting adjustment of status to an arriving

alien who is otherwise eligible for adjustment of status." *Id.* at 107. The BIA also clarified that "it is not necessary to reopen or terminate proceedings in order to allow an alien to pursue an application for adjustment of status before the USCIS." *Id.* at 112.

In response to *Yauri*, on November 13, 2009, Mhanna filed a Form I-485, applying to adjust his status to that of lawful permanent resident under INA § 245, based on his approved immediate relative petition. At that time he also filed a Form I-601 for a waiver of grounds of inadmissibility. (*See* Compl. ¶ 18, Docket No. 1.)

On December 8, 2009, USCIS filed a Request for Initial Evidence in support of Mhanna's application for adjustment of status. (*See* Ex. 2, Mot. to Reopen & Reconsider, Engebretson Aff. Ex. E, Docket No. 4.) The request stated that USCIS was "unable to complete the processing" of Mhanna's application for adjustment of status without certain initial information. USCIS requested that Mhanna submit evidence of his lawful admission or parole into the United States, and a Form I-693 Report of Medical Examination and Vaccination Record.

When Mhanna reported to ICE's office in Bloomington, Minnesota, on the morning of December 29, 2009, pursuant to the conditions of the May 14, 2008 order of supervision, he received a Notice of Revocation of Release, informing him that he "will be kept in the custody of U.S. Immigration and Customs Enforcement (ICE) at this time." (Engebretson Aff. Ex. G, Docket No. 4.) The notice stated, in relevant part:

> Your requests for a stay of removal have been denied by the 9th Circuit on December 9, 2009 and December 21, 2009. Additionally, the stay of removal filed with ICE Detention and Removal was denied December 29, 2009. Travel arrangements have been made and your removal is imminent.

> Based on the above, and pursuant to 8 C.F.R. § 241.4, you are to remain in ICE custody at this time. You will promptly be afforded an informal interview at which you will be given an opportunity to respond to the reasons for the revocation. If you are not released after the informal interview, you will receive notification of a new review, which will occur within approximately three months of the date of this notice.

(*Id.* at 1.) ICE took Mhanna into custody, and he was transported to the Ramsey County Jail. (Compl. ¶ 5, Docket No. 1.)

On January 8, 2010, Mhanna submitted various documents in response to the Request for Evidence. (Ex. 2, Mot. to Reopen & Reconsider, Engebretson Aff. Ex. E, Docket No. 4.) Mhanna provided the requested medical records, evidence of his lawful parole into the United States, and a notice of approval relative to a Fourth Preference I-130 Petition filed by Mhanna's brother. (*Id.* at 1.) The cover letter also argues that Mhanna's "inadmissibility ground may be overcome (or does not exist) because any false claim to U.S. citizenship by Mr. Mhanna was timely retracted by his own volition." (*Id.* at 2.) The documents Mhanna submitted as evidence of his lawful parole included his I-213 Record of Deportable/Inadmissible Alien, the December 8, 1998 Record of Sworn Statement, and information from his credible fear interview.

On January 14, 2010, Sharon V. Dooley, Field Office Director at the USCIS St. Paul Field Office, filed a notice of decision denying Mhanna's application to adjust status. (Engebretson Aff. Ex. B, Docket No. 4.) At the bottom of the notice is a notation stating, "Prepared By: RAH." (*Id.* at 1.) The decision states that Mhanna is excluded under INA § 212(a)(6)(C). (*Id.* at 2.) The decision also states that USCIS denied the Form I-601 application for waiver of inadmissibility. (*Id.*) It then states, "There is no appeal of this decision, but this denial is without prejudice to your ability to renew your

application before an Immigration Judge." (*Id.*) The decision did not address Mhanna's timely retraction defense. (Compl. ¶ 27, Docket No. 1.)

Also on January 14, 2010, Dooley filed a notice of decision denying Mhanna's application for waiver of grounds of inadmissibility. (Engebretson Aff. Ex. B at 3, Docket No. 4.) The decision found that Mhanna was not eligible for waiver because the USCIS found that Mhanna "falsely represented [him]self to be a United States citizen to gain admission pursuant to INA section 212(a)(6)(C)(ii)." (*Id.* at 5.) The waiver "does not apply to inadmissibility under INA section 212(a)(6)(C)(ii). There are no forms of relief available for this ground of inadmissibility." (*Id.*) The notice of decision stated that Mhanna may appeal the decision denying the application for waiver, and that in order to do so Mhanna must file his notice of appeal within thirty days. (*Id.* at 3.)

On January 15, 2010, Mhanna's counsel contacted Dooley by email, indicating that they had not yet received the January 14 decisions, and requested an opportunity to discuss the case. (Engebretson Aff. Ex. E, Docket No. 4.) Mhanna's counsel raised the issue of timely retraction. Dooley replied by email, stating, "I recommend that your office file a Motion to Reopen or Reconsider once you receive the notice. . . . Upon receipt of the motion, we will do everything possible to resolve this matter expeditiously." (*Id.*)

On January 19, 2010, Mhanna filed a motion to Reopen/Reconsider his I-485 application for adjustment of status. (Engebretson Aff. Ex. E, Docket No. 4.) The cover letter noted that the January 14, 2010 decision denying the I-485 application "fails to acknowledge th[e] defense" of timely retraction. (*Id.* at 1.) The motion stated, in part,

that "[t]he first attorney of record in these proceedings apparently missed the timely retraction argument, and this client should not be prejudiced by the acts of his previous and ineffective counsel." (*Id.* at 5.)  Mhanna submitted excerpts from the transcript of the 2002 proceedings before the IJ, as well as the IJ's opinion.  (Exs. 3-4, Engebretson Aff. Ex. E, Docket No. 4.)

On January 27, 2010, Dooley filed a notice of decision denying Mhanna's application to adjust status.  (Engebretson Aff. Ex. A, Docket No. 4.)  At the bottom of the notice is a notation stating, "Prepared By: RAH."  (*Id.* at 1.)  The decision cites relevant BIA case law and reviews the evidence in the record.  The decision concludes:

> In a written brief received by the Service on January 13, 2010, your attorney asserts the claim that you timely retracted your claim to United States citizenship during primary inspection on December 8, 1998.  A review of the testimony and documents on file indicate[s] that you retracted your claim to United States citizenship only after the primary inspector took you aside and began to ask you further questions regarding your country of origin.  This retraction took place only after it became apparent that the disclosure of the falsity of the statements was imminent.  As a result, your retraction was not timely and you are inadmissible to the United States pursuant to INA § 212(a)(6)(C)(ii).  It is noted that you failed to raise the timely retraction claim during proceedings before the Immigration Judge or the subsequent appeals process.
>
> On November 13, 2009, you filed for a waiver of your inadmissibility on Form I-601.  However, this agency denied the Form I-601.  As a result, you are inadmissible to the United States pursuant to INA § 212(a)([6])(C)(ii) and your application to adjust status is hereby denied.  There is no appeal of this decision, but this denial is without prejudice to your ability to renew your application before an Immigration Judge.

(Engebretson Aff. Ex. A at 3, Docket No. 4.)

### D.      Procedural History

On February 1, 2010, the Mhannas filed a civil complaint against defendants in the United States District Court for the District of Minnesota.  (Compl., Docket No. 1.)  The complaint "challenges the U.S. Department of Homeland Security's decision to deny the Application for Adjustment of Status" for Mhanna.  (*Id.* ¶ 1.)  It alleges that "the Defendants have erred as a matter of fact and law by finding that Plaintiff Assaf Mhanna is barred from adjustment of status at this time pursuant to INA § 212(a)(6)(C)(ii) (false claim to U.S. Citizenship)."  (*Id.* ¶ 4.)  The complaint requests that this Court assume jurisdiction of the case, declare that defendants' actions are an arbitrary and capricious abuse of discretion, enter judgment declaring that defendants' finding that Mhanna is ineligible to adjust his status is unlawful and of no force and effect, find that defendant acted in an arbitrary and capricious manner, and compel defendants to act upon the application for adjustment of status in accordance with the appropriate and applicable laws and regulations.  (Compl. at 11-2, Docket No. 1.)

Also on February 1, 2010, the Mhannas filed a Motion for Emergency Temporary Restraining Order and Request for Injunctive Relief.  (Docket No. 2.)  The motion requests that the Court "enter an emergency, temporary restraining order and preliminary injunction . . . enjoining Respondents from preventing Plaintiff Assaf Mhanna's release; releasing Plaintiff from physical custody pending the outcome of the instant action . . . ; and declaring that the actions and/or decisions of the Department of Homeland Security Citizenship and Immigration Services and Department of Homeland Security Immigration and Customs Enforcement were in violation of law."  (*Id.* at 1-2.)  In light of

ICE's representations on December 29, 2009, that "[t]ravel arrangements have been made and Mhanna's removal is imminent," the Court construes the motion as a motion to enjoin Mhanna's removal. (*See also* Mem. Supporting TRO & Emergency Req. for Injunctive Relief at 5, Docket No. 3 ("[I]f the Plaintiff is removed from the United States before his Federal Complaint is adjudicated, he will no longer remain eligible for adjustment of status – and faces a permanent bar to return to the United States."); *id.* at 15 ("[Mhanna] has been issued a valid travel document and, absent [] injunctive relief, his removal is imminent."); *id.* at 18 ("This Plaintiff should not be removed from the United States without the merits review on his petition, which raises significant legal questions.").)

The Mhannas filed various documents from the administrative record in support of the motion, and also filed letters in support of Mhanna from twenty individuals, including family members, friends, co-workers, and elected officials. (Engebretson Aff. Ex. H, Docket No. 4.) These letters attest to the quality of Mhanna's character, the potential risks and harms to Mhanna and his family should he be removed, and the important role Mhanna plays in his family and his community here in Minnesota. (*Id.*)

On February 10, 2010, defendants filed a response in opposition to the Mhannas' motion. (Docket No. 7.) On February 11, 2010, the Mhannas filed a reply as well as several additional exhibits in support of the motion, including emails in support of Mhanna. (Docket Nos. 8, 9.) The emails in support come from at least one hundred additional individuals expressing their wish that Mhanna be allowed to remain in the

United States with his family.  (Engebretson Aff. Ex. R, Docket No. 9.)  On February 11,

2010, the Court held a hearing on the motion.  (Docket No. 10.)

## ANALYSIS

The Court finds that it does not have jurisdiction to issue the requested temporary

restraining order and injunctive relief.

### A.     8 U.S.C. § 1252(f)(2) Governs the Mhannas' Motion

8 U.S.C. § 1252(f)(2) states:

> Notwithstanding any other provision of law, no court shall enjoin the
> removal of any alien pursuant to a final order under this section unless the
> alien shows by clear and convincing evidence that the entry or execution of
> such order is prohibited as a matter of law.

In *Nken v. Holder*, 129 S. Ct. 1749 (2009), the Supreme Court construed this statute in

the context of Nken's motion for stay of removal filed with the United States Court of

Appeals for the Fourth Circuit pending that court's resolution of Nken's appeal.  *Id.* at

1754-55.

The Court digresses briefly to provide some context regarding the evolution over

the past fifteen years of federal laws governing judicial review of immigration matters.

In *Nken*, the Supreme Court described the "changes in judicial review of immigration

procedures brought on by the Illegal Immigration Reform and Immigrant Responsibility

Act of 1996 (IIRIRA), 110 Stat. 3009-546, which substantially amended the Immigration

and Nationality Act (INA), 8 U.S.C. §§ 1101 *et seq.*"  *Id.* at 1755.  The Court observed

that in passing IIRIRA, Congress "repealed the old judicial-review scheme set forth in 8

U.S.C. § 1105a and instituted a new (and significantly more restrictive) one in 8 U.S.C.

§ 1252." *Id.* (internal quotation marks and brackets omitted).  For example, "Congress repealed the presumption of an automatic stay" pending adjudication of a petition for review of a deportation order, but also authorized courts to review the deportation order of an alien who had already left the United States.  *Id.*  Congress also adopted § 1252(f)(2), prohibiting courts from enjoining the removal of any alien pursuant to a final order unless the execution of such an order is prohibited as a matter of law.  *Id.* at 1756.

IIRIRA was only the beginning of Congress' efforts to limit the authority of the courts to review removal orders.  After the Supreme Court in *INS v. St. Cyr*, 533 U.S. 289, 304-05 (2001), held that the traditional scope of habeas corpus jurisdiction in the district court was still available for challenges to removal orders, Congress enacted the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231 (2005).  The REAL ID Act eliminated habeas jurisdiction for most removal orders, but authorized the circuit courts of appeals to review constitutional claims and questions of law.  *See, e.g.*, 8 U.S.C. § 1252(a)(2)(D) ("Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.").

These legislative actions stripping courts of jurisdiction to review removal orders have caused concern among jurists, scholars, and practitioners.  On February 8 and 9, 2010, the American Bar Association House of Delegates criticized these legislative restrictions on judicial authority.  The ABA House of Delegates adopted Proposal 114D,

a recommendation supporting "the restoration of federal judicial review of immigration decisions and urg[ing] Congress to enact legislation" supporting such restoration. Proposal 114D, Recommendation, House of Delegates, American Bar Association.[5]  The Report accompanying the recommendation recognizes that IIRIRA, the REAL ID Act, and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") impose "restrictions on federal judicial review [that] are exceptional in scope and establish a dangerous precedent of unreviewable government action.  As such, they are incompatible with the basic principles upon which this nation's legal system was founded."  Proposal 114D, Report at 4, House of Delegates, American Bar Association (internal quotation marks omitted).  The Report observes that "the exceptional scope of the restrictions on judicial review undermines confidence in the entire adjudication system, as these restrictions are perceived as a mechanism to insulate dysfunctional administrative processes and questionable exercise of executive discretion."  Proposal 114D, Report at 2, House of Delegates, American Bar Association.[6]  The Report adds that "[m]eaningful

---

[5]  The text of the Summary is available at http://www.abanow.org/wordpress/wp-content/themes/ABANow/wp-content/uploads/resolution-pdfs/MY2010/summaries/114D-adopted.pdf.  The text of the full Report is available at http://www.abanow.org/wordpress/wp-content/themes/ABANow/wp-content/uploads/resolution-pdfs/MY2010/114D.pdf.

[6]  *See also DeLaventura v. Columbia Acorn Trust*, 417 F. Supp. 2d 147, 148 n.1 (D. Mass. 2006) (Young, J.) ("It is reported that, having successfully eliminated the district courts, the executive will move on to eliminate the circuit courts as well.  To the extent that jurisdiction continues to inhere in the courts of appeal, the executive is already arguing that it – not the judiciary – must do the constitutional fact finding."); *Enwonwu v. Chertoff*, 376 F. Supp. 2d 42, 83 (D. Mass. 2005) (Young, C.J.) ("The REAL ID Act imposes a chokehold on the free and proper exercise of the writ of habeas corpus.  But it does more.  It reveals the drafters' deep distrust of the district courts, the nation's sole jury trial court."); *Gonzalez v. United States*, 135 F. Supp. 2d 112, 115 n.5 (D. Mass. 2001) (Young, C.J.) ("AEDPA and its cousin IIRIRA are recent examples of 'jurisdiction stripping' legislation, a legislative technique that descends

(Footnote continued on next page.)

judicial review plays an indispensable role in implementing the rule of law and checking administrative caprice." Proposal 114D, Report at 3, House of Delegates, American Bar Association. The Report calls on Congress to enact legislation to "restore judicial review of immigration decisions to ensure that noncitizens are treated fairly in the adjudication process and also to provide oversight for the government's decision making process." *Id.*

Having concluded this brief digression, the Court returns to *Nken*. In determining whether § 1252(f)(2) sets forth the standard governing Nken's motion for stay of removal, the Supreme Court distinguished between an injunction, as expressly referenced in § 1252(f)(2) ("no court shall enjoin the removal"), and a stay, as requested by Nken:

> A stay pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one. Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act – the order or judgment in question – not by directing an actor's conduct.

*Nken*, 129 S. Ct. at 1758. Chief Justice Roberts, writing for the majority, observed that "[a]n alien seeking a stay of removal pending adjudication of a petition for review does not ask for a coercive order against the Government, but rather for the temporary setting aside of the source of the Government's authority to remove." *Id.* The Court held that

_____

(Footnote continued.)

directly from bills proposed in the 1980s to strip federal courts of jurisdiction over abortion and busing. As commentators have noted, 'jurisdiction stripping' is, in effect, 'rights stripping,' because it removes, in a single stroke, the nuanced views of the 674 federal district judges from the rich common law tradition of evolutionary statutory interpretation and leaves the matter solely to twelve circuit courts of appeal and the Supreme Court. While society – acting through Congress – recoiled from thus rights stripping women and blacks, it had no such hesitancy concerning felons and aliens. Sadly, the fallout from *Bush v. Gore*, 531 U.S. 98 (2000), makes it likely that resort to this technique will become more frequent with the concomitant erosion of the very rights a truly independent judiciary was designed to protect." (some citations omitted)).

"[t]he terminology of subsection (f)(2) does not comfortably cover stays," and observed that the terms "enjoin" and "stay" "are by no means synonymous. *Id.* at 1759. The Court held that "an alien need not satisfy the demanding standard of § 1252(f)(2) when asking a court of appeals to stay removal pending judicial review." *Id.* at 1760.

Here, the Mhannas are seeking precisely the type of relief that § 1252(f)(2) governs. *Cf. id.* at 1766 (Alito, J., dissenting) ("We should not lightly conclude that Congress enacted a provision that serves no function, and the Court's hyper-technical distinction between an injunction and a stay does not provide a sufficient justification for adopting an interpretation that renders § 1252(f)(2) meaningless."). Mhanna concedes that he is subject to "an unexecuted final order of removal." (Compl. ¶ 18, Docket No. 1.) Mhanna's removal is imminent and the motion before the Court seeks to prohibit government actors from effectuating that removal. Therefore, the Court must determine whether Mhanna has "show[n] by clear and convincing evidence that the entry or execution of [his final] order [of removal] is prohibited as a matter of law." § 1252(f)(2); *see also* 8 U.S.C. § 1252(g) ("Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of an alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.").

**B.     The Mhannas Have Not Shown by Clear and Convincing Evidence That the Execution of Mhanna's Final Order of Removal Is Prohibited as a Matter of Law**

Mhanna filed his I-485 application for adjustment of status pursuant to 8 U.S.C. § 1255(a), which states:

> (a)     Status as person admitted for permanent residence on application and eligibility for immigrant visa
>
> The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

Even if a court were to agree with the Mhannas that USCIS's determination that Mhanna is ineligible to receive adjustment of status is erroneous, Congress has nonetheless given the Attorney General discretion to determine whether to grant an application for adjustment of status. *See* 8 U.S.C. § 1255(a) (stating that status "**may** be adjusted" and that the Attorney General has "**discretion** [to adjust an alien's status] . . . to that of an alien lawfully admitted for permanent residence"). Therefore, Congress does not "prohibit[] as a matter of law" the execution of Mhanna's final order of removal. *See* § 1252(f)(2). Hence, "[n]otwithstanding any other provision of law, no court shall enjoin [Mhanna's] removal." *Id.*

Because § 1252(f)(2) "sharply restricts the circumstances under which a court may issue an injunction blocking the removal of an alien from this country," *Nken*, 129 S. Ct. at 1754, and because those circumstances are not present here, the Court does not have jurisdiction to consider the Mhannas' otherwise potentially compelling case for injunctive

relief.  *Cf. Pinho v. Gonzales*, 432 F.3d 193, 204 (3d Cir. 2005) ("The agency action at issue here was final and non-discretionary, it adversely affected Pinho, and it has not been made non-reviewable by statute."); *Al Jabari v. Chertoff*, 536 F. Supp. 2d 1029, 1035 n.6 (D. Minn. 2008) ("Al Jabari is not using the APA to gain district-court review of the merits of a decision reached in an immigration proceeding; he is instead using the APA to seek an order compelling defendants to complete a security check."); *Martinez v. Dep't of Homeland Sec.*, 502 F. Supp. 2d 631, 635 (E.D. Mich. 2007) ("Since the INA does not expressly deprive the Court of jurisdiction to determine this issue, the APA may provide a basis for the Court's jurisdiction.")  Because the Court lacks jurisdiction to conduct the traditional analysis applicable to motions for temporary restraining orders and injunctive relief, *cf. Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc), the Court does not express any view on the merits of the Mhannas' claim at this time.  *Cf. id.* (including "the probability that movant will succeed on the merits" among the factors courts are to consider in considering motions for preliminary injunctive relief).

The Court recognizes the potentially tragic consequences of Mhanna's imminent removal, the valued contributions Mhanna makes to his family and to his community, as well as the overwhelming support the Mhannas have from their family, friends, and community here in Minnesota.  *Cf. Lamah v. Dep't of Homeland Sec.*, No. 05-1754, 2005 U.S. Dist. LEXIS 18181, at *11 (D. Minn. Aug. 25, 2005) (Frank, J.) ("This is a sad day for those who believe that when a judge adheres even-handedly to his or her oath of office, justice will prevail and the public interest will be served.  To the extent that a

civilized and democratic society is judged by the way in which it treats and protects its most vulnerable members, it has failed today."). As the ABA House of Delegates observed just days ago:

> The stakes in immigration cases are often high. Immigration courts determine whether a noncitizen will be forced to leave the United States, whether a family will be broken up, whether someone will be returned to a country suffering from violence, political instability, and economic disaster. Such decisions have an enormous impact on millions of families residing in the United States and should not be undertaken arbitrarily, yet these decisions, unlike discretionary decisions by other federal agencies, are unreviewable even under the deferential "abuse of discretion" standard.

Proposal 114D, Report at 4, House of Delegates, American Bar Association.

Congress has sharply restricted judicial authority to issue injunctive relief to block the removal of an alien pursuant to a final order of removal, and the Mhannas' motion for injunctive relief, albeit compelling, simply does not fall within the very narrow sliver of jurisdiction that Congress preserved. The Court finds it particularly inappropriate for the government to remove Mhanna before the Ninth Circuit resolves his pending petition – a petition the Ninth Circuit has stated raises questions that "are sufficiently substantial to warrant further consideration by a merits panel." *Mouhanna v. Holder*, No. 09-71937 (9th Cir. Dec. 9, 2009). Nonetheless, the Ninth Circuit has denied Mhanna's stay requests, and that court, rather than this one, appears to have jurisdiction to stay Mhanna's removal. *See Nken*, 129 S. Ct. at 1760-61; 8 U.S.C. § 12529f)(2). The Court therefore must deny the Mhannas' motion for lack of jurisdiction.

**ORDER**

Based on the foregoing and all the files, records, and proceedings herein, the Court

**HEREBY ORDERS** that Plaintiffs' Motion for Emergency Temporary Restraining

Order and Request for Injunctive Relief [Docket No. 2] is **DENIED**.


DATED:  February 16, 2010                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                            United States District Judge